FILED & ENTERED

DEC 28 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY pickett     DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Georges Marciano,<br><br>      Alleged Debtor. | Case No.: 2:09-bk-39630-VK<br><br>Memorandum of Decision<br><br>Date:      December 2, 2010<br>Time:     1:30 p.m.<br>Location:  Ctrm. 1675<br>           Roybal Federal Building<br>           255 East Temple Street<br>           Los Angeles, CA 90012 |

On October 27, 2009, Joseph Fahs, Steven Chapnick, and Elizabeth Tagle ("Petitioning Creditors") filed an involuntary Chapter 11 petition against Georges Marciano ("Marciano"). Petitioning Creditors hold amended judgments ("P.C. Judgments") issued by the Los Angeles Superior Court ("Superior Court") against Marciano aggregating $95.3 million. The Judgments were issued after the Superior Court issued discovery sanctions striking Marciano's answers to Petitioning Creditors' cross complaints. Petitioning Creditors now seek an order for relief against Marciano. Before the Court is an issue of first impression in the Ninth Circuit: are the P.C. Judgments, which are currently on appeal but have not been stayed, the subject of a bona fide dispute within the meaning of 11 U.S.C. § 303(b)(1)[1]? If not, is Marciano generally paying his debts as they become due within the meaning of § 303(h)(1)?[2]

---

[1] Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.
[2] The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157, and General Order No. 266 of the U.S. District Court for the Central District of California.

## I. Facts

### A. Marciano's Complaint and Judgment Creditors' Cross-Complaints

On August 13, 2007, Marciano filed a complaint against his former employee Joseph Fahs in the Superior Court. Marciano subsequently amended the complaint, adding his former employees Steven Chapnick, Miriam Choi, Elizabeth Tagle, and Camille Abat. *See* Georges Marciano's Request for Judicial Notice No. 1 ("Marciano First RJN") (Doc. No. 123) at Ex. 41 (Verified Second Amended Complaint ("Marciano Complaint"), Case No. BC375824). Fahs worked for Marciano for several months in 2007 as an information technology specialist. Marciano Complaint at ¶ 18. Chapnick worked for Marciano for four years as an administrative assistant. *Id.* at ¶ 22. Tagle worked for Marciano for nine years as a bookkeeper. *Id.* at ¶¶ 29, 86. Choi was Marciano's office manager and chief accountant, and had been employed by Marciano for over seventeen years. *Id.* at ¶ 4. Abat worked for Marciano as an administrative assistant for more than twelve years. *Id.* at ¶ 5.

Among other things, the Marciano Complaint alleges that while employed by Marciano, Petitioning Creditors Fahs, Chapnick, and Tagle "individually and collectively, engaged in a massive theft, misappropriation, and conversion of [Marciano's] personal and business property, assets, and money," including the theft of "tens of millions of dollars' worth of funds and fine art." Marciano Complaint ¶¶ 15, 83. Petitioning Creditors Fahs, Chapnick, and Tagle each filed separate cross-complaints alleging, *inter alia*, defamation and intentional infliction of emotional distress.[3]

### B. Marciano's Misuse of the Discovery Process

While prosecuting the Complaint against Petitioning Creditors, Marciano substituted counsel multiple times and conducted multiple depositions. Chapnick submitted to five deposition sessions. Four sessions were conducted by successive counsel for Marciano; the fifth was conducted by Marciano himself. Appellants' Appendix ("AA") at 5,037.[4] Chapnick's counsel sent correspondence to Marciano's eleventh and twelfth counsel seeking convenient

---

[3] The three cross-complaints were consolidated as Superior Court Case No. BC375824. *See* Marciano First RJN at Ex. 42 (Tagle Cross-Complaint, filed June 23, 2008), Ex. 45 (Chapnick Second Amended Cross-Complaint, filed November 5, 2008), and Ex. 46 (Fahs First Amended Cross-Complaint, filed November 13, 2008).
[4] Marciano submitted a 54-volume Appellants' Appendix to the California Court of Appeal in connection with the appeal entitled *Georges Marciano v. Joseph Fahs, et al.* (Case No. B218087). To assist in determining whether an

deposition dates for Marciano, but the requests were ignored. *Id.* Chapnick thereafter initially noticed Marciano's

deposition for October 6, 2008. *Id.* at 5,038. To accommodate Marciano's travel plans during Yom Kippur,

Chapnick renoticed the deposition for October 20, 2008. *Id.* at 2,644, 5,038.

Shortly before the October 20, 2008 deposition, Marciano, now represented by his thirteenth counsel, began

requesting a continuance. *Id.* at 5,038. Chapnick stated that he would agree to a continuance only if Marciano

provided alternate deposition dates. *Id.* Marciano refused to provide any alternative dates, so Chapnick refused to

continue the deposition. *Id.* On Friday, October 17 at 5:21 p.m., Marciano served a Motion for Protective Order

upon Chapnick. *Id.* at 1,098, 5,066.

On November 17, 2008, the Superior Court heard the Motion for Protective Order. The Superior Court denied

the Motion and sanctioned Marciano in the amount of $6,750 after finding that the Motion was made "without

substantial justification." *Id.* at 3,443. According to the Superior Court:

> I am extremely concerned that Mr. Marciano fails to appreciate the fact that the taking of his
> deposition is in no way dependent upon his receipt of discovery, particularly documents from third
> parties. He chose to file this lawsuit. And to the extent that we are looking at a trial date which is
> relatively imminent, his inability to cooperate and make himself available for deposition gives this
> Court great pause. I do not think the motion for protective order is well taken. I think we are
> bordering on obstreperous conduct.

*Id.* at 3,431.

Subsequent to denial of the Motion for Protective Order, Chapnick attempted to negotiate a date for Marciano's

deposition, but Marciano refused to provide any dates on which he would be available. Chapnick accordingly

renoticed Marciano's deposition for December 3, 2008. *Id.* at 2,658. At 4:54 p.m. on December 2, 2008, Marciano

faxed Chapnick a "Demand for Certified French Interpreter and Objections to Amended Notice of Deposition of

Plaintiff Georges Marciano." *Id.* at 2,663. Marciano did not appear at the December 3 deposition. *Id.* at 5,040.

---

order for relief should be entered, the Court ordered Marciano to file the portions of the Appellants' Appendix
reflecting the Superior Court record with respect to the entry of terminating sanctions against Marciano. The
relevant portions of the Appellants' Appendix were filed in the present case as Doc. Nos. 144–150.

*C. Judgment Creditors' Motions for Terminating Sanctions With Respect to Marciano's Complaint*

On December 3, 2008, Chapnick filed a motion seeking terminating sanctions against Marciano with respect to the Marciano Complaint ("Chapnick Motion"). AA at 2,615–82. Tagle, Fahs, Choi and Abat and subsequently joined the Chapnick Motion. *Id.* at 2,684–92 (Defendant Elizabeth Tagle's Joinder in the Motion of Steven Chapnick for an Order Granting Terminating Sanctions); *id.* at 2,750–56 (Defendant Joseph Fahs' Joinder in Defendant Stephen Chapnick's Motion); *id.* at 5,355 (Superior Court order stating that Choi and Abat had joined the Chapnick Motion). After a hearing, the Superior Court entered an order granting the Chapnick Motion on January 21, 2009. *Id.* at 5,355 (Order Granting Defendants Steven Chapnick, Joseph Fahs, Miriam Choi, Camille Abat, Elizabeth Tagle and Deborah McCleod's Motion for Terminating Sanctions ("Chapnick Order")).

The Chapnick Order noted that "Marciano's continuing refusal to agree to sit for deposition is indicative of his pattern of discovery abuses," and explained that "terminating sanctions are appropriate in this matter given the extraordinary and flagrant nature of Marciano's refusal to submit to deposition in violation of Code of Civil Procedure Section 2023.010(d)." *Id.* at 5,363. The Chapnick Order made detailed findings[5] with respect to Marciano's misuse of the discovery process:[6]

1. Marciano has filed no fewer than 16 substitutions of counsel changes in this case, causing substantial burden, delay, confusion and expense to the Court and all parties. This multiplicity of substitutions were made for strategic and/or tactical reasons known only to Marciano.
2. The Court finds that the record is replete with evidence of the efforts to obtain Marciano's deposition prior to and after seeking judicial intervention….. Specifically: Prior to initially noticing Marciano's deposition, Chapnick's counsel sent correspondence to Marciano's 11th counsel (Lavely & Singer) and Marciano's 12th counsel (Richardson & Patel) seeking convenient deposition dates for Marciano…. These requests were entirely ignored

---

[5] Marciano objected to the form of the Chapnick Order, arguing that findings of fact stated in the order did not accurately reflect the Superior Court's ruling. AA at 4,988-4,995. Notwithstanding Marciano's objections, the Superior Court made only two material alterations to the order prior to entry. First, the Superior Court modified paragraph three as follows (italics indicate language added by the Superior Court): "The Court finds that *the record is replete with evidence of the* defendants' ~~made extraordinary~~ efforts to obtain Marciano's deposition prior to and after seeking judicial intervention." Second, the Superior Court deleted paragraph eleven of the proposed order. Paragraph eleven contained findings that Marciano misused the discovery process by subjecting defendants to multiple deposition sessions.

[6] The Court has substituted its own paragraph numbers for those contained in the Chapnick Order and has omitted internal citations to the Superior Court record.

3. After all such requests for input were ignored by Marciano, Chapnick initially noticed Marciano's deposition to take place on October 6, 2008. At the request of Marciano's 12th counsel … that deposition was re-set to October 20, 2008, in order to accommodate Marciano's plans for out-of-town travel to celebrate Yom Kippur.

4. A few days before the rescheduled October 20, 2008 deposition, Marciano, now represented by his 13th counsel (Ingber & Associates), began requesting a continuance of the October 20 deposition. Chapnick stated he would only continue the deposition if Marciano provided alternate dates for the deposition. Marciano refused to provide even a single alternative date.

5. Marciano served no objection to the deposition. At 5:21 p.m. on October 17, 2008—the Friday before the Monday, October 20 deposition, Marciano faxed a notice of motion for protective order—set for November 17, 2008, effectively stopping the deposition….

6. Marciano's motion for protective order was heard on November 17, 2008. Marciano was by then represented by his 14th counsel (Daniels, Fine). Marciano's arguments were twofold: (a) that his 13th (and later his 14th) counsel needed time to learn the case; and (b) that he still needed to obtain discovery prior to being deposed. Marciano's arguments in support of his motion for protective order were not well received by the Court…. Specifically, the Court found that Marciano's willful and repeated substitutions of counsel invalidate his claims that each of his new attorneys made claiming a need for more time to prepare for Marciano's deposition. The Court similarly found that Marciano's objections to the taking of his deposition based upon the alleged failure of the defendants and/or non-parties to comply with their discovery obligations are both improper and meritless…. The Court found and ruled that Marciano's making of the motion for protective order constituted the making, unsuccessfully and without substantial justification, of a motion to limit discovery—in violation of Code of Civil Procedure Section 2023.010(h) and denied the motion, ordering monetary sanctions against Marciano in the amount of $6,750.

7. Marciano substituted in his 15th counsel two days later (on November 19, 2008). Over the following several days, counsel for Chapnick was in contact with Marciano's 15th counsel … to request deposition dates on which Marciano would submit to deposition. Marciano's 15th counsel, Mr. Silverstein, repeatedly informed counsel for Chapnick that Marciano would not submit to a deposition in the instant action until after Gary Iskowitz was deposed in the related *Marciano v. Iskowitz* action…. On December 1, 2008 counsel for Chapnick advised Marciano's 15th counsel … that because Marciano was continuing to refuse to arrange for his deposition, Chapnick was setting the deposition … to recommence on December 3, 2008.

8. A few minutes before the close of business on December 2, 2008 Marciano's counsel faxed Chapnick a "Demand for a Certified French Interpreter and Objections to Amended Notice of Deposition of Plaintiff Georges Marciano" wherein Marciano demands "the services of a court-certified French interpreter for the purposes of his deposition." … This "Demand" marks the first time in the course of this litigation that Marciano has ever suggested that he has need for an interpreter. The Court finds that the objection based on the need for an interpreter was made in a bad faith effort to delay and or avoid the deposition of Marciano, and to improperly cause … excessive expense and delay in conducting the deposition.

9. Notwithstanding the Court's specific Order to the contrary, in *ex parte* papers … Marciano once again took the position that he need not submit to deposition until he had completed discovery to his own level of satisfaction.

10. Marciano has been repeatedly ordered to comply with discovery and sanctioned for discovery abuses in both this action and in the related *Iskowitz* action, demonstrating a consistent pattern of discovery abuses that will not be—and has not been—resolved by a lesser sanction and given Marciano's months-long lack of cooperation in providing straightforward information, witnesses and documents to support his claims, the Court finds that an order compelling Marciano's deposition is likely to be futile.

11. Marciano's well-documented history demonstrating his pattern of discovery abuse is significant in deciding whether to impose terminating sanctions. *Mileikowsky v. Tenet Healthsystem*, 128 Cal.App.4th 262, 279–80, 26 Cal.Rptr.3d 831 (2005) ("But where a violation is willful, *preceded by a history of abuse*, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction"); *Collisson & Kaplan v. Hartunian*, 21 Cal.App.4th 1611, 1618, 26 Cal.Rptr.2d 786 (1994) ("Defendants chose to ignore the *many attempts*, both formal and informal, made by plaintiff *to secure fair responses* from them").

*Id.* at 5,356–64 (emphasis in original).

### D. Judgment Creditors' Motions to Strike Marciano's Answers to Judgment Creditors' Cross-Complaints

On December 19, 2008, Choi and Abat filed a motion seeking to strike Marciano's answers to Choi and Abat's cross-complaints or, in the alternative, compel Marciano to appear for a deposition on January 6, 2009 ("First Abat Motion"). *Id.* at 3,401–02. The First Abat Motion sought sanctions based on Marciano's failure to appear at a deposition noticed for December 15, 2008. *Id.* at 3,398. Abat and Choi served notice of Marciano's deposition on November 26, 2008 after Marciano failed to respond to Abat and Choi's request for dates upon which he would be available. *Id.* at 3,397–98. On December 12, Marciano served a "Demand for Certified French Interpreter and Objections to Miriam Choi's and Camille Abat's Notice of Deposition" ("Demand"). *Id.* at 3,475. The Demand incorrectly stated that Abat and Choi had "unilaterally set Mr. Marciano's deposition, making no effort to find a mutually convenient date." *Id.* at 3,476. The Demand further provided that "Mr. Marciano is unavailable for deposition on December 15, 2008 through January 5, 2009, due to family commitments." *Id.* at 3,476.

On January 5, 2009, the Superior Court conducted a hearing on the First Abat Motion and ordered Marciano to appear for deposition on January 6. Marciano protested that he was too sick to appear on January 6: "I'm still sick, your honor. If you give me two days, it will be fine. I really apologize for that, but two days will be great." *See* Notice of Filing of Appellants' Opening Brief and Related Application in the *Fahs* Appeal (Doc. No. 153) (quoting

from Superior Court record), at 14. The Superior Court refused to postpone the deposition: "Mr. Marciano, I'm sorry if you are not feeling well, but it's going forward tomorrow." *Id.*

Marciano did not appear for the January 6 deposition. Instead, at 8:39 a.m. on January 6, Marciano's counsel sent an e-mail stating that Marciano would not appear. Attached to the e-mail was a letter from Dr. Davis S. Silver stating in relevant part: "Mr. Marciano is not capable of attending his deposition on January 6, 2009 as I believe it would likely cause a worsening of his respiratory condition in his present, weakened state. If he continues to improve at present rate, he should be able to complete his deposition by next week." AA at 4,626. On January 7, Choi and Abat filed an ex-parte application for an order shortening time ("Ex-Parte Application") on a motion to strike Marciano's answer ("Second Abat Motion"). On January 8, the Superior Court denied the Ex-Parte Application but ordered Marciano to appear for deposition on January 12 and 23. The Superior Court's order provided that the January 12 and 23 depositions were to continue "from day to day thereafter until Cross-Complainants determine that the deposition is completed." *Id.* at 4,683–84. The Superior Court ordered that "[a]ll issues of terminating sanctions on Marciano's Answer [to the cross-complaints] are reserved for a future hearing date of January 27." *Id.* at 4,684.

On January 12 at 8:44 a.m., Marciano's counsel notified opposing counsel that Marciano would not be appearing for the deposition: "I have just learned that Mr. Marciano had a continuing health issue over the weekend and either has been or is being admitted to the hospital. He will not be appearing for deposition today." *Id.* at 5,094.

On January 16, 2009, Chapnick filed a motion to strike with prejudice Marciano's answer to Chapnick's cross-complaint and to bar Marciano from defending against the cross-complaint ("Second Chapnick Motion"). *Id.* at 5,036. On January 27, the Superior Court granted the Second Abat Motion, striking Marciano's answers to the cross-complaints of Choi and Abat. *Id.* at 6,009. The Superior Court ordered further briefing on the Second Chapnick Motion so that it could determine whether terminating sanctions could be implemented, given that Marciano had not yet filed a response to Chapnick's Third Amended Cross-Complaint. *Id.* at 6,009. The Superior Court denied Tagle and Fahs' motions to join the Second Chapnick Motion. *Id.*

On February 4, 2009, Chapnick filed a new motion to strike Marciano's answer to Chapnick's cross-complaint ("Third Chapnick Motion"). The purpose of the Third Chapnick Motion was to resolve a procedural issue:

> As Marciano had (on January 27) not yet responded to Chapnick's Third Amended Cross-Complaint, a procedural issue was raised at that time regarding implementation of the ruling in favor of Chapnick…. Chapnick served his Third Amended Cross-Complaint on January 12, 2009. For this reason, it is anticipated that Marciano will have responded to Chapnick's Third Amended Cross-Complaint (or defaulted) by February 17, 2009—thus resolving the procedural issue described above.

*Id.* at 6,147.

Fahs and Tagle filed similar motions to strike Marciano's answers to their respective cross-complaints, also on February 4. *Id.* at 6,426 (Fahs); 6,443 (Tagle). On March 2, 2009, the Superior Court conducted a hearing on the motions to strike filed by Chapnick, Fahs, and Tagle. The Superior Court struck Marciano's answer as to each cross-complaint and entered Marciano's default.[7] The Superior Court explained its reasoning in a March 2, 2009 minute order:

> The court has inherent power to strike defendant's answer and enter its default for a defendant's misconduct in the [sic] "extreme situations." … The court in *Del Junco* held that as to a court's authority to impose terminating sanctions and strike pleadings as a discovery sanction:
> "Trial courts should only exercise this authority in extreme situations, such as when the conduct was clear and deliberate, where no lesser alternatives would remedy the situation, the fault lies with the client and not the attorney, and when the court issues a directive that the party fails to obey." [*Del Junco v. Hufnagel*, 150 Cal.App.4th 789, 799 (Cal. Ct. App. 2007) (internal citations omitted).]
> [California] Code of Civil Procedure § 2025.450(d) provides: "If that party or party-affiliated deponent then fails to obey an order compelling attendance, testimony, and production, the court may make those orders that are just, including the imposition of an issue sanction, an evidence sanction, or a terminating sanction under Chapter 7."
> Here, the sanction requested seems proper based on the circumstances. This court has already made detailed findings regarding Marciano's repeated abuse of the discovery process.
> The motions to strike were based on the exact same misconduct of Marciano.

AA at 7,364–65.

---

[7] *See* Minute Order, filed March 2, 2009 (AA at 7,364); Order Granting Fahs' Motion for Terminating and Evidentiary Sanctions (*id.* at 8,145); Order on Cross-Complainant Elizabeth Tagle's Notice of Motion and Motion to Strike Answer of Cross-Defendants Georges Marciano and Beverly Wilshire Properties, Inc.; and to Enter Default Against Cross-Defendants (*id.* at 8,218); Order Granting Motion for Terminating Sanctions (Chapnick v. Marciano) (*id.* at 8,228).

*E. Superior Court Judgments Against Marciano*

On May 15 and 18, 2009, the Superior Court conducted a default prove-up trial. On July 20, 2009, the Superior Court entered orders finding Marciano liable to the Petitioning Creditors on their respective claims for defamation and intentional infliction of emotional distress.[8] On July 20, the Superior Court empanelled a twelve-person jury to determine damages. The jury awarded $74.044 million in damages to each Petitioning Creditor—consisting of $35 million for defamation, $34.044 million for severe emotional distress, and $5 million in punitive damages. After reducing the jury awards so that the damages did not exceed the amount demanded in each cross-complaint, the Superior Court entered judgment in favor of Fahs for $55 million; in favor of Chapnick for $25 million; and in favor of Tagle for $15.3 million.[9]

In addition to the P.C. Judgments, judgments in favor of five other individuals in the amount of approximately $190 million have been entered against Marciano. The aggregate amount of all judgments against Marciano is approximately $260 million. Georges Marciano's Statement of Genuine Issues of Fact and Law ("Marciano SUF") (Doc. No. 130) at ¶ 1.

On July 24, 2009, Marciano filed two Petitions of Mandate/Prohibition/Stay with the California Court of Appeal, seeking an order vacating the trial court's decision to empanel an advisory jury to determine damages. Both petitions were denied. Petitioning Creditors' RJN at Ex. 9; Marciano SUF at ¶ 20. On August 4, 2009, Marciano appealed the P.C. Judgments. Marciano SUF at ¶ 13. On August 10, 2009, Marciano filed with the California Court of Appeal a Petition for a Writ of Supersedeas ("Supersedeas Petition") as well as a Request for Immediate Stay Pending Consideration of Petition for a Writ of Supersedeas with respect to five of the judgments. Petitioning Creditors' RJN at Ex. 7; Marciano SUF at ¶¶ 16–17. On August 13, 2009, the Court of Appeal denied the Supersedeas Petition. *Id.* On August 14, Marciano filed a Petition for Review with the California Supreme Court

---

[8] *See* Order Determining Liability Issues on the Second Amended Cross-Complaint of Joseph Fahs Against Georges Marciano and Beverly Wilshire Properties, Inc. (Petitioning Creditors' RJN, Ex. 5A); Order Determining Liability Issues on the Second Amended Cross-Complaint of Steven Chapnick Against Georges Marciano and Beverly Wilshire Properties, Inc. (*id.* at Ex. 5B); Order Determining Liability of Cross-Defendants Georges Marciano and Beverly Wilshire Properties, Inc. on Cross-Complaint of Elizabeth Tagle (*id.* at Ex. 5C).
[9] *See* Judgment for Joseph Fahs (Petitioning Creditors' RJN, Ex. 6A); Judgment for Steven Chapnick (Petitioning Creditors' RJN, Ex. 6B); Judgment for Elizabeth Tagle (Petitioning Creditors' RJN, Ex. 6C).

1   seeking to overturn denial of the Supersedeas Petition. The California Supreme Court denied the Petition for Review

2   on August 19. *Id.* Therefore, although the P.C. Judgments have been appealed, no stay pending appeal is in effect.

3        Before the involuntary petition was filed, two of the three Petitioning Creditors (Fahs and Chapnick) and the

4   five other judgment creditors tried to enforce their judgments against Marciano. Declaration of Daniel J. McCarthy

5   in Opposition to Petitioning Creditors' Motion for Summary Judgment ("McCarthy Decl.") (Doc. No. 126) at ¶ 19.

6   Chapnick and Fahs employed separate counsel specializing in collection matters. *Id.* Chapnick obtained charging

7   and assignment orders, as well as orders for third parties to appear for depositions. *Id.* Judgment creditors Abat and

8   Choi attempted to serve Marciano with an order to appear for a judgment debtor exam. *Id.* at ¶ 21. Tagle attempted

9   to settle, but joined the involuntary petition after her settlement offer was rejected. *Id.*

10  *F. Involuntary Chapter 11 Petition Against Marciano*

11       On October 27, 2009, the Petitioning Creditors filed the instant involuntary petition against Marciano (Doc. No.

12  1). The Petitioning Creditors served the involuntary summons on Marciano on October 31, 2009 (Doc. No. 7).

13  Marciano timely controverted the petition by filing a Motion to Dismiss Involuntary Chapter 11 Petition or,

14  Alternatively, to Quash Service ("Motion to Dismiss") (Doc. No. 8) on November 20, 2009.[10]  After a hearing

15  conducted on January 13, 2010, the Court denied this Motion to Dismiss. *See* Doc. No. 90.

16       On February 1, 2010, Marciano filed an Answer to Involuntary Petition ("Answer") (Doc. No. 28). On May 18,

17  2010, relying on § 305, he filed a Motion to Dismiss or Stay Involuntary Chapter 11 Case ("Section 305 Motion")

18  (Doc. No. 57).  On July 2, 2010, the Court denied the Section 305 Motion (Doc. No. 102), and Marciano timely filed

19  a motion for reconsideration (Doc. No. 105).

20       On May 20, 2010, the Petitioning Creditors filed a Motion for Summary Judgment to Cause an Order for Relief

21  Under Title 11 of the U.S. Code to be Entered Against Alleged Debtor Georges Marciano (Doc. No. 79).  On June

22  18, 2010, the Petitioning Creditors withdrew that motion (Doc. No. 98); on July 14, 2010, they filed a renewed

23

24

25  [10] Fed. R. Bankr. P. 1011(b) requires that defenses and objections to an involuntary petition be filed within 21 days
of service of the involuntary summons.

1   Motion for Summary Judgment ("Second Motion for Summary Judgment") (Doc. No. 107). The Court set a

2   combined hearing on the Second Motion for Summary Judgment and Marciano's motion for reconsideration.

3   *G. Status of Marciano's Appeal of the Superior Court Judgments*

4       On October 13, 2010, Marciano filed an opening brief in his appeal of the P.C. Judgments. *See* Georges

5   Marciano's Supplemental and Restated Status Report on Appeals ("Status Report") (Doc. No. 155) at ¶ 5. On

6   October 29, 2010, the Court of Appeal issued a scheduling order requiring the Petitioning Creditors' briefs to be

7   filed by January 31, 2011. *Id.* at ¶ 8. Marciano's reply brief will be due twenty days after the Petitioning Creditors'

8   briefs are filed. *Id.* at ¶ 9. Assuming that the Petitioning Creditors file their briefs on the January 31, 2011 deadline,

9   briefing may not be completed until February 20, 2011. *Id.*

10  **II. Second Motion for Summary Judgment**

11      Section 303(b), which governs the commencement of an involuntary petition, provides in relevant part:

12          An involuntary case against a person is commenced by the filing with the bankruptcy court of a
            petition under chapter … 11 of this title by three or more entities, each of which is either a holder
13          of a claim against such person that is not contingent as to liability or the subject of a bona fide
            dispute as to liability or amount, … if such noncontingent, undisputed claims aggregate at least
14          $13,475 more than the value of any lien on property of the debtor securing such claims held by the
            holders of such claims.
15

16  Where a petition is timely controverted, the court must enter an order for relief against the debtor if, after trial, the

17  court determines that "the debtor is generally not paying such debtor's debts as such debts become due unless such

18  debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h).

19      The Bankruptcy Reform Act of 1978 made it easier for petitioning creditors to commence an involuntary

20  petition by abolishing the requirement that petitioning creditors prove the debtor had committed one of six specific,

21  highly technical, and narrowly defined "acts of bankruptcy." *See* Susan Block-Lieb, *Why Creditors File So Few*

22  *Involuntary Petitions and Why the Number Is Not Too Small*, 57 Brook. L. Rev. 803, 805 (1991) ("Congress was

23  aware that creditors found the 'acts of bankruptcy' too difficult to prove, and adopted the current 'general failure to

24  pay' standard in an effort to ease these problems of proof."). The purpose of this reform was "to encourage creditors

25  to file involuntary petitions at an earlier stage in a debtor's financial troubles, before value is lost." *Id.* According to

the Report of the Commission on the Bankruptcy Laws of the United States ("Bankruptcy Commission Report"), a

"major factor explaining the smallness of distributions in [involuntary] business bankruptcies is the delay in the

institution of proceedings for liquidation until assets are largely depleted." H.R. Doc. No. 137, 93d Cong., 1st Sess.

(1973), Part 1 at 14. The Commission reasoned that expediting the involuntary petition process was necessary to

prevent the estate from suffering "a further diminution in value during the interim between the filing of the petition

and the ultimate resolution of the issues raised by the petition and answer thereto." *Id.* Inability to commence an

involuntary proceeding expeditiously, the Commission concluded, "has frustrated a prime goal of federal bankruptcy

legislation, equitable treatment of creditors":

> As previous studies have shown, assets are substantially or totally consumed or encumbered by the
> time relief is sought under the Bankruptcy Act …. The recommendations of the Commission as to
> involuntary proceedings should … substantially reduce expensive litigation [and] …
> accommodate the initiation of early proceedings, either by a creditor or the debtor, enhancing the
> possibility of dividends to all creditors, and reducing preferences to aggressive creditors.

Bankruptcy Commission Report, Part 1 at 190–91.

Courts have reiterated the reasoning expressed in the Bankruptcy Commission Report. "The central policy

behind involuntary petitions," one court explained, is "to protect the threatened depletion of assets or to prevent the

unequal treatment of similarly situated creditors." *In re Manhattan Indus., Inc.*, 224 B.R. 195, 200 (Bankr. M.D. Fla.

1997); *see also In re Letourneau*, 422 B.R. 132, 138 (Bankr. N.D. Ill. 2010) (same). "Creditors are justified in filing

an involuntary bankruptcy against a debtor where exclusive bankruptcy powers and remedies may be usefully

invoked to recover transferred assets, to 'insur[e] an orderly ranking of creditors' claims' and 'to protect against

other creditors obtaining a disproportionate share of a debtor's assets.'" *In re Hentges*, 351 B.R. 758, 772 (Bankr.

N.D. Okla. 2006) (quoting *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989)); *see also In re Tichy*

*Elect. Co. Inc.*, 332 B.R. 364, 372 (Bankr. N.D. Iowa 2005) ("The goal or purpose of an involuntary filing should be

the equal distribution of assets among creditors.").

The Petitioning Creditors move for summary judgment on their claims that Marciano is not generally paying his

debts as they become due and that the debts are not the subject of a bona fide dispute as to liability or amount. In

1  opposition, Marciano moves for summary judgment in his favor on the grounds that as a matter of law, Petitioning

2  Creditors cannot meet the requirements of § 303.

3  Fed. R. Civ. Proc. 56 provides that summary judgment is appropriate "if the pleadings, the discovery and

4  disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

5  movant is entitled to judgment as a matter of law."[11] The summary judgment standard "provides that the mere

6  existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion

7  for summary judgment; the requirements is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

8  *Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986) (emphasis in original).

9  Substantive law determines which facts are material. 477 U.S. at 248. "Only disputes over facts that might affect the

10  outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* The Court must

11  apply "the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252.

12  To prevail upon their motion for summary judgment, the Petitioning Creditors must establish the five elements

13  of § 303 by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112

14  L.Ed.2d 755, 764 (1991) (concluding that where the statute fails to prescribe the standard of proof, the

15  preponderance of the evidence standard generally applies in civil actions between private litigants). That is, the

16  Petitioning Creditors must establish that (1) three or more creditors (2) hold claims against the alleged debtor that

17  are not contingent as to liability and (3) are not the subject of a bona fide dispute as to liability or amount (4) in the

18  aggregate amount of at least $13,475, and (5) that the alleged debtor is generally not paying such debtor's debts as

19  such debts become due. *See* 11 U.S.C. §§ 303(b), (h).[12] It is undisputed that the three Petitioning Creditors hold non-

20  contingent claims against Marciano in an aggregate amount in excess of $13,475. Marciano SUF ¶¶ 1–4. Therefore,

21  elements one, two, and four are satisfied. At issue are elements three and five—whether the claims are the subject of

22  a bona fide dispute as to liability or amount and whether Marciano is generally paying his debts as they become due.

23

24  [11] Fed. R. Civ. Proc. 56 is made applicable to these proceedings by Fed. R. Bankr. Proc. 7056.
   [12] Marciano asserts that a genuine issue of material fact exists as to whether Petitioning Creditors filed the petition in

25  bad faith. As explained in Section II.C, before entering an order for relief, a court is not required to evaluate whether
   an involuntary petition was filed in bad faith. Moreover, based on the undisputed facts here and the applicable legal
   standard, there is no basis to hold that Petitioning Creditors filed their petition against Marciano in bad faith.

*A. Payment of Debts as They Become Due*

To be entitled to an order for relief, the Petitioning Creditors must demonstrate that Marciano is generally not paying his debts as they become due unless those debts are the subject of a bona fide dispute. *See* 11 U.S.C. § 303(h). Reviewing the legislative history of § 303(h), the Second Circuit Court of Appeals quoted the following passage from the Bankruptcy Commission Report:

> The scope and meaning of "generally unable" and "generally failed" are left to the courts; it is not possible to lay down guidelines that will fit all cases. However, it is clear that the court must find more than prospective inability to pay only a few of the debtor's liabilities when they fall due and more than a past failure to pay only a few of his debts. It is intended that the court consider both number and amount in determining whether the inability or failure is general.

*B.D. Intern. Discount Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Intern. Discount Corp.)*, 701 F.2d 1071, 1075 (2d Cir. 1983), *cert. denied*, 464 U.S. 830 (1983) (quoting Bankruptcy Commission Report, Part 2 at 75).

The Bankruptcy Commission Report further stated that the "generally not paying" standard was intended to promote judicial flexibility:

> The Commission's recommendations as to the structure of the system make it possible to give substantial discretion to the judge. This provides a far better safeguard against unwise and malicious petitions than the existing, litigation-producing restrictions on the institution of involuntary proceedings.

Bankruptcy Commission Report, Part 1 at 190.

"The Ninth Circuit has adopted a 'totality of the circumstances' test for determining whether a debtor is generally not paying its debts under 11 U.S.C. § 303(h)." *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1072 (9th Cir. 2002) (quoting *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985)). "[M]erely establishing the existence of a few unpaid debts" is not sufficient. *Semel v. Dill (In re Dill)*, 731 F.2d 629, 632 (9th Cir. 1984).  Nonetheless, there is "substantial authority for the proposition that even though an alleged debtor may owe only one debt, or very few debts, an order for relief may be granted where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default." *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–351

(Bankr. E.D.N.Y. 1996). For example, courts have entered an order for relief "where the creditors were few in number but a large amount was owed to them." *Id.* at 351. An alleged debtor's ability or plan to pay creditors is also important. In one instance, the Ninth Circuit Court of Appeals affirmed the bankruptcy court's entry of an order for relief based on the finding that the alleged debtor was "a company that had substantial amounts of unpaid bills and no plans or ability to pay them." *Focus Media, Inc. v. Nat'l Broad. Co. (In re Focus Media)*, 378 F.3d 916, 929 (9th Cir. 2004).

Marciano does not dispute that he is not paying the eight judgment creditors. Marciano SUF ¶ 3. The total amount of the judgments is approximately $260 million. Marciano admits that he does not have $260 million in cash or cash equivalents to pay the judgments. *Id.* at ¶ 22. In the state court action, Marciano filed a declaration from his certified public accountant  estimating his net worth at $175 million. *Id.*

Like the alleged debtor in *Focus Media*, Marciano has no plan or ability to pay the judgments. *See also In re Huggins*, 380 B.R. 75, 80–81 (Bankr. M.D. Fla. 2007) (concluding that entry of an order for relief was appropriate where the debtor conceded that he had no ability to pay a judgment creditor's debt). The amount owed to Marciano's judgment creditors—$260 million—is substantial. *See Fischer*, 341 B.R. at 350–51 (holding that "an order for relief may be granted where such … debts are sufficiently substantial to establish the generality of the alleged debtor's default"). Applying the totality of the circumstances test, the Court determines that Marciano is generally not paying his debts as they become due.[13] Accordingly, Petitioning Creditors are entitled to an order for relief unless the debts are the subject of a bona fide dispute.

*B. Bona Fide Dispute as to Liability or Amount*

*1. Burden of Proof*

The Court may not enter an order for relief against Marciano if the claims of the Petitioning Creditors are "the subject of a bona fide dispute as to liability or amount." § 303(b)(1), (h)(1). "Establishing the existence or absence

---

[13] Marciano also disputes a claim filed by the trustee for Marc Dreier and a claim filed by the California Franchise Tax Board ("FTB") and requests additional time "to conduct discovery from the claimants to show that the claims are the subject of a bona fide dispute." Opposition at 10. The Court has not considered the Dreier and FTB claims in determining that Marciano is generally not paying his debts as they become due. On the present record, the Court cannot determine whether these debts are the subject of a bona fide dispute.

of a bona fide dispute involves a shifting burden of proof. A petitioning creditor must establish a prima facie case

that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating

that a bona fide dispute does exist." *In re Biogenetic Technologies, Inc.*, 248 B.R. 852, 856 (Bankr. M.D. Fla. 1999)

(internal citation omitted).

By virtue of the P.C. Judgments, Petitioning Creditors have established a prima facie case that no bona fide

dispute exists. *See Platinum Financial Services Corp. v. Byrd (In re Byrd)*, 357 F.3d 433, 438 (4th Cir. 2004)

(existence of unstayed state court judgments in favor of petitioning creditors established prima facie case that no

bona fide dispute existed with respect to related claims). Consequently, Marciano must demonstrate that the P.C.

Judgments are the subject of a bona fide dispute.

*2. Approaches to Applying § 303(b) in the Context of Unstayed, Unpaid Final Judgments*

Application of § 303(b) to an unstayed, unpaid final judgments on appeal is an issue of first impression in the

Ninth Circuit. Courts addressing the issue have articulated two approaches. The most frequently cited case on the

subject, *In re Drexler*, sets forth the following standard:

> [A] claim based upon an unstayed final judgment as to which an appeal has been taken by the
> debtor is not the subject of a bona fide dispute. Once entered, an unstayed final judgment may be
> enforced in accordance with its terms and with applicable law or rules, even though an appeal is
> pending. The filing of an involuntary petition is but one of many means by which a judgment
> creditor may seek to attempt collection of something upon its judgment.
> It would be contrary to basic principles respecting, and would effect a radical alteration of, the
> long-standing enforceability of unstayed final judgments to hold that the pendency of the debtor's
> appeal created a "bona fide dispute" within the meaning of Code § 303.

*In re Drexler*, 56 B.R. 960, 967 (Bankr. S.D.N.Y. 1986) (internal citations omitted).

An alternative line of cases rejects *Drexler*'s *per se* rule. In *Byrd*, the Fourth Circuit Court of Appeals

acknowledged that "it will be the unusual case in which a bona fide dispute exists in the face of claims reduced to

state court judgments," but added that "[s]uch judgments do not guarantee the lack of a bona fide dispute." 357 F.3d

at 438. According to the *Byrd* court, "the purpose of the 'bona fide dispute' provision is to prevent creditors from

using involuntary bankruptcy to 'coerce a debtor to satisfy a judgment even when substantial questions may remain

concerning the liability of the debtor.'" *Id.* (quoting *In re Prisuta*, 121 B.R. 474, 476 (Bankr. W.D. Pa. 1990)).

Therefore, notwithstanding judgments in a creditor's favor, "substantial questions may remain about a debtor's liability." *Id.* The *Byrd* approach requires the bankruptcy court to determine whether the alleged debtor's appeal of the trial court's ruling is sufficiently meritorious to create a bona fide dispute. *In re AMC Investors, LLC*, 406 B.R. 478, 485 (Bankr. D. Del. 2009).

In interpreting § 303, the Court is mindful that, "where … the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, 298 (1989) (internal citation omitted). The Bankruptcy Code, however, does not define "bona fide dispute." Where, as here, the language of the statute is ambiguous, the Court may "look to legislative history to aid in the interpretation." *Thrifty Oil Co. v. Bank of America Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1057 (9th Cir. 2003).

   *3. Legislative History of § 303*

The 1978 Code permitted creditors to commence an involuntary petition if the creditors held claims "not contingent as to liability." Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2549, 2559 (Nov. 6, 1978). In 1984, Congress amended the statute to require that creditors hold claims "not contingent as to liability *or the subject of a bona fide dispute*." Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAJFA"), Pub. L. 98-353, Tit. 3, § 426(b)(1), 98 Stat. 333, 369 (July 10, 1984). In 2005, Congress added an additional requirement: creditors must hold claims "not contingent as to liability or the subject of a bona fide dispute *as to liability or amount*." Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Tit. 3, § 1234(a)(1)(A), 119 Stat. 23, 204 (Apr. 20, 2005).

The 1984 change to § 303(b) arose from an amendment to BAFJA introduced by Senator Max Baucus. Neither the Senate or House Reports explain the reasoning for Senator Baucus' amendment. The only explanation in the legislative record is Senator Baucus' brief floor statement:

> Some courts have interpreted section 303's language on a debtor's general failure to pay debts as allowing the filing of involuntary petitions and the granting of involuntary relief even when the debtor's reason for not paying is a legitimate and good-faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability, but who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings.

My amendment would correct this problem. Under my amendment, the original filing of an involuntary petition could not be based on debts that are the subject of a good-faith dispute. between the debtor and his or her creditors. In the same vein, the granting of an order of relief could not be premised solely on the failure of a debtor to pay debts that were legitimately contested as to liability or amount.

I believe this amendment, although a simple one, is necessary to protect the rights of debtors and to prevent misuse of the bankruptcy system as a tool of coercion. I also believe it corrects a judicial misinterpretation of existing law and congressional intent as to the proper basis for granting involuntary relief.

130 Cong. Rec. S.7,618 (daily ed. June 19, 1984).

Senator Baucus also was a sponsor of the 2005 amendment to § 303(b), which added the additional requirement that creditors must hold claims "not contingent as to liability or the subject of a bona fide dispute *as to liability or amount*." 119 Stat. at 204. According to Senator Baucus, the provision was intended to further

congressional intent that an involuntary bankruptcy action should not be employed by litigants seeking to gain more leverage than they would have if they disputed contract performance in the proper judicial forum. The respondent in a bona fide dispute over liability for a claim or the amount thereof should not be disadvantaged by the stigma and expense of an involuntary bankruptcy proceeding.

148 Cong. Rec. S.11,728 (daily ed. Nov. 20, 2002).

In light of this legislative history, the Court finds the *Drexler* approach better reasoned and more consistent with the intent of Congress. In California, creditors holding an unstayed judgment may invoke state law remedies to collect upon that judgment, even if the judgment is on appeal.[14] Within the context of an unstayed judgment, the coercive aspect of an involuntary bankruptcy proceeding is significantly diminished—if not eliminated entirely—given that a judgment creditor can take advantage of other collection remedies. The concern of judgment creditors improperly using the Bankruptcy Code as a club or tool of coercion is not at issue when those creditors could alternatively use such collection remedies as

---

[14] Cal. Code Civ. P. § 917.1(a)(1) provides that "[u]nless an undertaking is given, the perfecting of an appeal shall not stay enforcement of the judgment or order in the trial court if the judgment or order is for … money or the payment of money." As one court explained, the "statute is clearly designed to protect the judgment won in the trial court from becoming uncollectible while the judgment is subjected to appellate review. A successful litigant will have an assured source of funds to meet the amount of the money judgment, costs and postjudgment interest after postponing enjoyment of a trial court victory." *Grant v. Superior Court*, 257 Cal. Rptr. 564, 568 (Cal. Ct. App. 1990) (internal citation omitted). Marciano was ineligible for a stay because he did not post an undertaking. In lieu of an undertaking, Marciano attempted to obtain a writ of supersedeas staying execution of the judgment pursuant to Cal. Code Civ. P. § 923, but his application was denied.

levying upon the debtor's property[15] (including forcibly seizing property located in a debtor's private residence upon court order if the debtor fails to surrender the property),[16] liquidating the property through an execution sale,[17] or garnishing the debtor's wages.[18] As one court aptly stated:

> The *Byrd* court identified the purpose of the "bona fide dispute" provision as being "to prevent creditors from using involuntary bankruptcy to coerce a debtor to satisfy a judgment even when substantial questions may remain concerning the liability of the debtor." However, the "array of state court enforcement procedures" available to judgment creditors outside of bankruptcy can and are used by those creditors to coerce payment. Nonetheless, courts allow the enforcement of unstayed judgments that are subject to appeal. There is simply no federal interest requiring a different result.

*AMC Investors*, 406 B.R. at 487 (quoting *Byrd*, 357 F.3d at 438).

*4. State Law Property Interests*

As noted by the *AMC Investors* court, the *Byrd* approach runs counter to the *Butner* principle. The *Butner* principle "provides that, in the absence of a specific provision to the contrary, bankruptcy courts take non-bankruptcy rights and laws as they find them." *AMC Investors,* 406 B.R. at 486. As explained by the Supreme Court:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 141–42 (1979).

---

[15] Cal. Code Civ. P. § 699.710 provides that "all property that is subject to enforcement of a money judgment … is subject to levy under a writ of execution to satisfy a money judgment."

[16] If a judgment debtor fails to delivery property located in a private residence to the levying officer, California law permits the judgment creditor to apply for a court order "directing the levying officer to seize the property in the private place." Cal. Code Civ. P. § 699.030(b). If the judgment debtor refuses to deliver the property voluntarily, "the levying officer may cause the building or enclosure where the property is believed to be located to be broken open in such manner as the levying officer reasonably believes will cause the least damage." *Id.*

[17] Cal. Code Civ. P. § 701.530 sets forth the procedures under which an execution sale of personal property is conducted.

[18] Cal. Code Civ. P. § 706.020 et seq. sets forth the procedures by which a creditor may garnish a judgment debtor's wages.

No one disputes that outside of bankruptcy, the Petitioning Creditors have a right to collect upon the P.C.

Judgments. Yet Marciano's position impedes the Petitioning Creditors' ability to collect by using the provisions of

the Bankruptcy Code—including those provisions which ensure equality of distribution among similarly situated

creditors. A key justification for the Petitioning Creditors' filing of an involuntary petition is "to protect against

other creditors obtaining a disproportionate share of a debtor's assets." *Hentges*, 351 B.R. at 772 (internal citation

omitted). More troubling still, Marciano asks this Court to substitute its own views on the validity of the P.C.

Judgments for those of the state court.[19]

If the Court evaluated the P.C. Judgments and decided that Marciano may succeed in his appeal, Petitioning

Creditors' ability to institute a bankruptcy case would be forced to await a decision of the California Court of

Appeal,[20] and perhaps a further appeal and subsequent decision of the California Supreme Court. If these state

appellate courts uphold the P.C. Judgments, the Petitioning Creditors' ability to pursue an involuntary bankruptcy

would have been substantially delayed, with a concomitant risk of Marciano's inappropriate dissipation of his

assets.[21]  Petitioning Creditors should not be required to bear the risk of a mistaken conclusion by this Court,

---

[19] For example, in the present case, the Court would be required to evaluate the prospects of Marciano's appeal with respect to the following state-law issues: Did the Superior Court abuse its discretion by issuing terminating sanctions against Marciano? Was the Superior Court's award of damages sufficiently disproportionate to the evidence so as to suggest that the judgment resulted from passion and prejudice? Did the cross-complainants proffer sufficient evidence to justify the damages awarded? Were the compensatory damages unreasonable and excessive? Were the punitive damages awards supported by sufficient evidence of Marciano's financial condition? Did the cross-complaints state with sufficient specificity the allegedly libelous statements supporting the damages awards? Did the allegedly libelous statements constitute opinions (not actionable as libel)? Did the award of damages for both "shame, mortification, and hurt feelings" in connection with the libel cause of action, as well as damages for "emotional distress" in connection with the intentional infliction of emotional distress cause of action, constitute a prohibited double recovery? Did the Superior Court judge's allegedly negative comments about Marciano make a fair trial impossible? Was the advisory jury severely prejudiced by the trial court's conduct of the damages prove-up trial? *See generally* Notice of Filing Appellants' Opening Brief and Related Application in the *Fahs* Appeal (Doc. No. 153).
   It is not enough that Marciano points to multiple alleged errors in the Superior Court's decision. An alleged debtor "cannot create a bona fide dispute with respect to each of the petitioner's claims through mere litigiousness." *In re Ross*, 63 B.R. 951, 954 (Bankr. S.D.N.Y. 1986).
[20] As stated in Part I.G., the parties may not complete briefing before the Court of Appeal before February 20, 2011. The Court of Appeal will require additional time to issue a decision.
[21] Marciano urges this Court to find that the P.C. Judgments are the subject of a bona fide dispute if there is even a "possibility" that they will be reversed on appeal.  Adopting this lenient standard would only heighten the risks of unjustly suspending the Petitioning Creditors' ability to proceed with an involuntary petition.

1   especially considering that under California law, the P.C. Judgments remain enforceable pending appellate review

2   unless Marciano posts a supersedeas bond.

3        *5. Equality of Distribution*

4        In addition to avoiding this Court's intrusion into the sphere of the state courts, the *Drexler* approach facilitates

5   the "prime bankruptcy policy of equal distribution among similarly situated creditors." *Danning v. Bozek (In re*

6   *Bullion Reserve of North America)*, 836 F.2d 1214, 1217 (9th Cir. 1988). It does so by eliminating the uncertainty

7   that would otherwise cause holders of unstayed, unpaid judgments to hesitate before commencing an involuntary

8   petition.

9        In the absence of an involuntary petition, creditors can collect upon judgments only by invoking state law

10  remedies that contain no provisions for pro rata distribution among competing creditors. In the case of an alleged

11  debtor who lacks sufficient funds to satisfy all judgments, like Marciano, some judgment creditors may obtain a

12  complete recovery to the detriment of others. Such an outcome contravenes the "central policy behind involuntary

13  petitions," which is "to protect the threatened depletion of assets or to prevent the unequal treatment of similar

14  situated creditors. Whenever this situation is implicated, a creditor should be able to compel liquidation or

15  reorganization of the Debtor's estate through an involuntary petition." *Manhattan Industries,* 224 B.R. at 200.

16       Absent a *per se* rule, creditors holding unstayed, unpaid judgments on appeal must engage in expensive

17  litigation to convince the bankruptcy court that the judgments are not the subject of a bona fide dispute. By contrast,

18  without making any additional showing, these same creditors may pursue state law collection remedies. Imposing a

19  more onerous standard for the commencement of a bankruptcy case discourages creditors from taking advantage of

20  the orderly, collective dispute resolution procedures a bankruptcy case provides, and instead encourages them to

21  "rac[e] to the courthouse to dismember the debtor." *Bullion Reserve of North America*, 836 F.2d at 1217.

22       Absent a *per se* rule, judgment creditors undeterred by the burdens of such additional litigation face another

23  threat in the form of § 303(i). Section 303(i) provides:

24

25

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment against the petitioners and in favor of the debtor for costs; or a reasonable attorney's fee.

Although an award pursuant to § 303(i) "is discretionary with the Court," an "involuntary debtor's motion for attorney's fees and costs under § 303(i) raises a rebuttable presumption that reasonable fees and costs are authorized." *Higgins v. Vortex Fishing Sys., Inc.*, 379 F.3d 701, 706–07 (9th Cir. 2004) (internal citation omitted). Any "petitioning creditor in an involuntary case … should expect to pay the debtor's attorney's fees and costs if the petition is dismissed." *Id.* at 707 (internal citation omitted). Congress drafted § 303(i) "to make an award of costs and fees the norm," and § 303(i)'s predecessor statute, Bankruptcy Rule 115(e), "makes such awards 'routine.'" *In re Kidwell*, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993).

Absent a *per se* rule, judgment creditors must assess whether a bankruptcy court will hold that the pendency of an appeal renders their unstayed judgments the subject of a bona fide dispute. If they wrongly rely on their judgments, these creditors risk substantial liability under § 303(i). The lack of a *per se* rule creates a fundamental dilemma. Judgment creditors can pursue state law collection remedies, hoping that they reach the debtor's assets before those assets are seized by other creditors or otherwise dissipated. Or they can file an involuntary petition and risk § 303(i) liability. Although § 303(i) damages will not be awarded in every case, the mere possibility of liability will have a chilling effect on judgment creditors. [22]

*6. Applying Drexler's Per Se Rule in the Context of a Sanctions Judgment*

Marciano emphasizes that the P.C. Judgments were entered after the Superior Court struck Marciano's answers to the cross-complaints and entered his default. Marciano characterizes the P.C. Judgments as "default judgments" and proffers cases in which courts held that a default judgment may be the subject of a bona fide dispute. *See, e.g.,*

---

[22] At oral argument, counsel for Marciano hinted that such an award of attorney's fees might not be warranted in this case: "The ninth consideration is that they [Petitioning Creditors] have a risk of fees and there's a chilling effect imposed on them if you were to determine that there's a bona fide dispute. That's not true. Section 303(i)(1), which is the sanction provision, says that a court may grant judgment for the fees and costs, not required. Where you have issues of first impression and disputes like this, I'm sure you would take that into account in deciding the fee issue. This is a case of first impression, as I pointed out. There are unrelated—unresolved appeals that haven't been accounted for too, and that would need to be taken into account in deciding whether to award sanctions." Transcript of Proceedings, October 1, 2010 (Doc. No. 141) at 103:10–21.

1    *In re Henry S. Miller Commercial, LLC*, 418 B.R. 912, 921 (Bankr. N.D. Tex. 2009) (citing "a default judgment

2    where facts were not actually litigated" as an example of a situation justifying an "inquiry into whether a bona fide

3    dispute exists"); *AMC Investors*, 406 B.R. at 487 (declining to extend *Drexler*'s *per se* rule to default judgments); *In*

4    *re Graber*, 319 B.R. 374, 379–80 (Bankr. E.D. Pa. 2004) (same); *Prisuta*, 121 B.R. at 476 (concluding that

5    judgments may be the subject of a bona fide dispute based in part on the fact that "no hearings at all were held prior

6    to the entry of the judgments against alleged debtors").

7         Marciano's categorization of the P.C. Judgments as "default judgments" misses the mark. Unlike the default

8    judgments discussed in *Miller Commercial*, *AMC Investors*, *Graber*, and *Prisuta*, the discovery sanctions imposed

9    against Marciano did not result from his mere failure to appear. On the contrary, Marciano was actively participating

10    in the litigation before the Superior Court struck Marciano's answers to the cross-complaints. As a result of his

11    inappropriate and dilatory conduct, Marciano forfeited his opportunity to continue to litigate in the trial court.

12    Consequently, Marciano's situation is not comparable to that of the alleged debtors in *Prisuta*; in that case, "no

13    hearings at all were held prior to the entry of the judgments against alleged debtors." 121 B.R. at 476.

14         In concluding that default judgments may be the subject of a bona fide dispute, *Miller Commercial*, *AMC*

15    *Investors*, *Graber*, and *Prisuta* endorse the policy of deciding disputes on the merits. In the context of a sanctions

16    judgment, the policy of deciding disputes on the merits justifies a *per se* rule that such judgments are not the subject

17    of a bona fide dispute. "One of the principal purposes of the Discovery Act is to enable a party to obtain evidence in

18    the control of his adversary in order to further the efficient, economical disposition of cases according to right and

19    justice on the merits." *Fairfield v. Superior Court for Los Angeles Cnty.*, 54 Cal. Rptr. 721, 725 (Cal. Ct. App. 1966)

20    (internal citations omitted); *see also Williams v. Volkswagenwerk Aktiengesellschaft*, 226 Cal. Rptr. 306, 310 (Cal.

21    Ct. App. 1986) (stating that the purpose of the discovery rules is to "enhance the truth-seeking function of the

22    litigation process and eliminate trial strategies that focus on gamesmanship and surprise"). Terminating sanctions are

23    awarded only against parties whose abuse of the discovery process continues notwithstanding the imposition of

24    lesser sanctions. *Del Junco v. Hufnagel*, 60 Cal. Rptr. 3d 22, 29 (Cal. Ct. App. 2007). Therefore, terminating

25    sanctions advance the truth-seeking function of litigation by prodding parties to fulfill their discovery obligations.

Determining that a claim based on a sanctions judgment is the subject of a bona fide dispute would reward the party whose conduct thwarted the policy of settling disputes on the merits.[23]

Whether non-appearance default judgments should likewise be subject to such a *per se* approach is not before this Court. Resolution of that question does not affect the Court's decision to adopt a *per se* rule that sanctions judgments are not the subject of a bona fide dispute. The conduct giving rise to a sanctions judgment is far more egregious than that giving rise to a non-appearance default judgment. Under California law, a sanctions judgment is imposed only after the offending party disrupts the truth-seeking function of litigation by failing to comply with discovery obligations; by contrast, a non-appearance default judgment is imposed when the defaulted party simply does not appear. Such conduct might not be sufficiently disruptive to deprive alleged debtors of the opportunity to assert that the claim at issue is the subject of a bona fide dispute. Moreover, a non-appearance default judgment may have resulted from insufficient service of process. *See, e.g., In re Starlite Houseboats, Inc.*, 426 B.R. 375, 383 (Bankr. D. Kan. 2010) (finding that judgment was the subject of a bona fide dispute because it was unclear whether service had been properly executed). That concern is not present in connection with a sanctions judgment.

   *7. Appropriate Access to Bankruptcy Courts*

   Finally, applying *Byrd* and assessing the prospects of a judgment debtor's pending appeal would significantly circumscribe the ability of tort judgment holders to institute an involuntary petition. None of the courts that have examined the state court record in order to assess the presence of a bona fide dispute about a judgment have delved into tort law.[24]

---

[23] One of the appealed judgments that the *Drexler* court concluded was not the subject of a bona fide dispute arose from discovery sanctions. The trial court entered a default sanctions judgment against the alleged debtor upon finding "that defendants have failed to comply with … orders of the Court and that defendants have repeatedly obstructed proper discovery in this action and that, accordingly, plaintiffs are entitled to an order striking defendants' answer and counterclaims and directing entry of a judgment on default against defendants, jointly and severally." *Drexler*, 56 B.R. at 962 n.4. The *Drexler* court explained that the sanctions judgment "is not a default judgment insofar as it grants sanctions and directs the striking of the answer and counterclaim. The Sanctions Judgment goes on to grant judgment of liability by default in petitioners' favor on the other portions of the District Court Action complaint because there was, as a result of the striking of the answer and counterclaim, no legally cognizable opposition." *Id.* at 964.

[24] In *Prisuta*, one of the alleged debtors was the principal of Shaker Mechanical Corporation, and both alleged debtors personally guaranteed Shaker's debts. The petitioning creditors' judgments were based on the alleged debtors' failure to fulfill their obligations as guarantors. 121 B.R. at 475. In *Graber*, the court examined whether the alleged debtor would likely prevail upon her state court motion to open a default judgment. The *Graber* court

1    In comparison to damages arising from breach of contract, tort damages involve many factors and considerable

2    discretion by the fact-finder. This is particularly true where, as in this case, the tort damages compensate for

3    emotional injury stemming from defamation and intentional infliction of emotional distress. Tort judgment debtors

4    will always be able to assert that the damages awarded are excessive in comparison to the emotional harm inflicted.

5    Determining whether such assertions create a bona fide dispute "is unnecessarily intrusive into the trial court's

6    ruling and undermines the objective analysis of bona fide disputes." *AMC Investors*, 406 B.R. at 485. *AMC*

7    *Investors*' statement that "*Byrd* turns the court into an odds maker on appellate decision-making" applies with even

8    greater force in the fact-intensive realm of tort judgments. *Id. See also Bertero v. National General Corp.*, 529 P.2d

9    608, 624 n.12 (Cal. 1974) (the "vast variety of and disparity between awards in … [tort] cases demonstrate that

10    injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as

11    such is a subject particularly within the province of the trier of fact").

12    Marciano argues that the Superior Court committed error by entering the terminating sanctions and urges the

13    Court to review the Superior Court record to determine whether the terminating sanctions were appropriate. Faced

14    with the same situation, the *Drexler* court refused to second-guess the state court:

15

16

17

18

19    determined that the alleged debtor would not likely prevail because she had failed to supply an adequate explanation
for her initial failure to respond. 319 B.R. at 383. In *Byrd*, the judgment was based on the alleged debtor's failure to
20    pay credit card debts. 357 F.3d at 438. In *Starlite Houseboats*, the petitioning creditors' judgment was based on
claims of breach of contract, lost profits, successor liability, breach of warranty, and fraud. 426 B.R. at 378.
21    However, it was unnecessary for the *Starlite* court to evaluate any of these claims. Instead, the *Starlite* court found
that the petitioning creditors' claim was the subject of a bona fide dispute based on a service defect in the state court
22    litigation. *Id.* at 382. In *Amanat*, the petitioning creditors' judgment was based on a claim that the alleged debtor had
fraudulently induced the petitioning creditor to sell an interest in a business for less than its true value. 321 B.R. at
23    33. The *Amanat* court was not required to evaluate the merits of the judgment because the alleged debtor's only
defense was that he believed the judgment was the subject of a bona fide dispute and had filed an unperfected notice
24    of appeal. *Id.* at 38. In *Miller Commercial*, the judgment was based on claims of fraud and negligent
misrepresentation. 418 B.R. at 916. While declining to adopt an irrebuttable presumption that an unstayed judgment
25    could never be the subject of a bona fide dispute, the *Miller Commercial* court stated that it was inappropriate to
"prob[e] into the details of the judgment." *Id.* at 922. Rather, a judgment would be considered the subject of a bona
fide dispute only of it contained "patent irregularities," such as "naming a non-party as a liable party." *Id.* at 922–23.

> Drexler has urged that the District Court erred in striking his answer and counterclaim as a
> sanction, and that the sanction was excessive. This court must accept the Sanctions Judgment as it
> is, right or wrong, and is not free to act as a kind of super-appellate court to correct what it may
> see as the errors or omissions of other courts…. The Sanctions Judgment … must be taken to
> preclude relitigation of the issues in this court.

56 B.R. at 969–70.

In a similar vein, the court in *In re Ross* held that a judgment was not the subject of a bona fide dispute notwithstanding the alleged debtor's post-trial motions: "It is unnecessary and inappropriate for this court to engage in speculation over the possible outcome of Ross' pending motion to vacate the judgment and for a new trial." 63 B.R. at 967. Like those courts, this Court holds that it should not take on the role of the state appellate courts in assessing the propriety of the Superior Court's discovery sanctions against Marciano.

### *C. Bad Faith*

Marciano argues that an order for relief should not be entered because "[t]here is a genuine issue of material fact regarding whether the involuntary Chapter 11 petition was filed in bad faith . . . ." Opposition at 46. Marciano asserts that he is entitled to discovery regarding Petitioning Creditors' subjective reasons for filing the involuntary petition and argues that the involuntary case should be dismissed if the Petitioning Creditors filed it for an improper reason. *Id.* at 47. As examples of the Petitioning Creditors' alleged bad faith, Marciano contends that Tagle filed the involuntary petition with Chapnick and Fahs after Marciano rebuffed her efforts to settle the matter, that Chapnick and Fahs were two of the most aggressive creditors in pursuing judgment enforcement, that none of the judgment creditors had made a significant recovery, *i.e.*, in excess of $2 million, on his or her unstayed judgment before the involuntary petition was filed and that, after filing the involuntary petition, the Petitioning Creditors opposed Marciano's motion for relief from the automatic stay so that Marciano could pursue his appeals.

Section 303(b), which sets forth the requirements for filing an involuntary petition, does not contain any language regarding the good faith of petitioning creditors. Section 303(i), however, provides that if the court dismisses the involuntary petition "other than on consent of all petitioners and the debtor," the court may grant judgment "against any petitioner that filed the petition in bad faith, for any damages proximately caused by such filing."

At the outset, it is generally inappropriate for the court to consider the good faith or bad faith of petitioning creditors when determining whether to enter the order for relief. *See, e.g.*, *Kaplan v. Breslow (In re WLB-RSK Venture)*, 320 B.R. 221 at *6 n.13 (9th Cir. BAP 2004) (unpublished disposition) ("If the grounds for relief exist under section 303, the good faith or bad faith of the petitioning creditor appears irrelevant"); *Ross*, 63 B.R. at 955 (stating that an inquiry into whether the petitioning creditors commenced the involuntary petition in "bad faith," to "harass and annoy the debtor," or with "malice and lack of justification" would be unnecessary if the court sustained the involuntary petition and entered an order for relief). Nonetheless, the Court will address Marciano's allegations of bad faith given that the issue can readily be determined based upon the undisputed facts and the applicable legal standard.

"[T]here is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." *Lubow Machine Co. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.)*, 209 F.3d 100, 105 (2d Cir. 2000) (internal citation omitted). "Whether a party acted in bad faith is essentially a question of fact. Bad faith should be measured by an 'objective test' that asks 'what a reasonable person would have believed.'" *Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.)*, 61 B.R. 614, 620 (9th Cir. BAP 1986) (internal citation omitted); *see also In re Mi La Sul*, 380 B.R. 546, 557 (Bankr. C.D. Cal. 2007) (same).

The Court concludes that Marciano is not entitled to discovery "regarding the subjective reasons why the petitioning creditors filed the involuntary petition." Opposition at 47. Where a review of the facts associated with the filing of the involuntary petition indicate that a reasonable person would be justified in filing the petition, the specific motivations of the petitioning creditors are irrelevant. Here, a reasonable person could have concluded in good faith that the filing of an involuntary petition was justified. Marciano was facing multiple unstayed judgments that he could not afford to pay in full.

Moreover, Marciano's examples of "bad faith" are not convincing.  The fact that the judgment creditors had not experienced tremendous success in their collection efforts before some of them filed the involuntary petition does not mean the petition was filed in bad faith. Given that eight creditors held substantial unstayed judgments, the

1  Petitioning Creditors were faced with the imminent prospect that one judgment creditor might succeed in collecting

2  to the detriment of others.

3       Similarly, Petitioning Creditor Tagle's attempt to reach a settlement with Marciano before she filed the

4  involuntary petition is not demonstrative of bad faith.  A creditor's attempt to settle, followed by a change in tactics

5  when settlement proves unsuccessful, does not constitute bad faith. To hold otherwise would discourage creditors

6  from trying to resolve payment disputes consensually before they turn to the remedy of filing an involuntary

7  petition.

8       Permitting Marciano to probe Petitioning Creditors' reasons for filing the involuntary petition—where the

9  undisputed facts indicate that a reasonable creditor would be justified in doing so—would needlessly prolong the

10  time period before this matter can be resolved.  The inevitable delay would contravene the provisions of Fed. R.

11  Bankr. P. 1013, which provides that "[t]he court shall determine the issues of a contested petition at the earliest

12  practicable time and forthwith enter an order for relief, dismiss the petition, or enter any other appropriate order."

13  Finally, none of the cases cited by Marciano as to this issue are applicable to the facts at hand.[25]

14  **III. Motion for Reconsideration**

15       Marciano seeks reconsideration of the denial of his Section 305 Motion, arguing that the Court should suspend

16  proceedings in the involuntary petition pending the outcome of Marciano's appeals. Marciano argues that a

17  suspension will preserve the status quo and will avoid unnecessary time and expense "until it is known based upon

18  the outcome of the appeals whether the petitioning creditors really have judgments that will be affirmed, or at least

19  will be affirmed in a large enough amount beyond which Mr. Marciano could not pay them." Motion for

20  Reconsideration of Order Denying Motion to Dismiss or Stay Involuntary Chapter 11 Case ("Motion for

21  Reconsideration") (Doc. No. 105) at 8.

22

23

---

24  [25] In *In re Mi La Sul*, the court's finding of bad faith was based on a collusive filing between the petitioning creditors
and the alleged debtor designed solely to provide the alleged debtor additional time to negotiate with the secured
lender to conduct a short sale of real property. 380 B.R. at 548. In *In re WLB-RSK Venture*, the holder of a 50%
25  interest in a partnership filed an involuntary petition against the partnership to gain a new opportunity to litigate
issues that had already been resolved in state court. 296 B.R. 509, 514 (Bankr. C.D. Cal. 2003).

Section 305(a) provides that the court "may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if the interests of creditors and the debtor would be better served by such dismissal or suspension." An order of dismissal or suspension under § 305(a) "is an 'extraordinary remedy' of 'narrow breadth,' which may be utilized 'to prevent the commencement and continuation of disruptive involuntary cases.'" *Wechsler v. Macke Intern. Trade, Inc. (In re Macke Intern. Trade, Inc.)*, 370 B.R. 236, 247 (9th Cir. BAP 2007) (quoting 2 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy*, ¶ 305.01[1] (15th ed. Rev. 2005). To determine whether the interests of creditors and the debtor would be better served by suspension, the Court must consider "the totality of the circumstances." *Id.* The legislative history of § 305(a) is instructive:

> The court may dismiss or suspend [the involuntary petition], … for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment.

*Id.* (citing H.R. Rep. No. 95-595 at 352 (1977); S. Rep. No. 95-989 at 35–36 (1978)).

The vast majority of cases applying § 305 focus on dismissal rather than suspension. In fact, the Court's research has identified only one reported case in which the bankruptcy court suspended the proceedings. *See In re Rookery Bay, Ltd.*, 190 B.R. 949 (Bankr. M.D. Fla. 1995). In *Rookery Bay*, the claim of the single petitioning creditor was based on an appealed state court judgment confirming an arbitration award. *Id.* at 950. All other creditors had agreed to defer collection proceedings. *Id.* The court concluded that it was appropriate to suspend further proceedings pending resolution of the state court appeal. *Id.* at 951.

As in *Rookery Bay*, the Petitioning Creditors' claims arise from a state court judgment now on appeal. The similarities end there. *Rookery Bay* was a two-party dispute, whereas the present case involves substantial claims held by eight judgment creditors. The non-petitioning creditors in *Rookery Bay* had voluntarily agreed to postpone collection efforts, an indication that they would not be prejudiced by a delay in the prosecution of the involuntary. No such agreement exists here. The involuntary petition in *Rookery Bay* resembles the legislative history's example of a case "commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payments": it was filed by a single petitioning creditor after other creditors had agreed to postpone collection efforts. Finally,

suspension of the *Rookery Bay* proceedings did not substantially prejudice the petitioning creditor because the alleged debtor's only asset, an apartment complex, was severely underwater. 190 B.R. at 951. By contrast, Marciano holds substantial assets that could be administered through the bankruptcy process. In light of these significant differences, *Rookery Bay*—which appears to be the only reported case invoking suspension—does not support use of the suspension remedy here.

Some courts have applied a seven factor test to determine whether the totality of the circumstances supports suspending proceedings:

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464–65 (Bankr. S.D.N.Y. 2008); *see also In re 801 South Wells Street Ltd. Partnership*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996).

Marciano focuses primarily on factor one, the economy and efficiency of administration. Marciano argues that the interests of the Petitioning Creditors would be better served by suspension because unnecessary expenses would be avoided. As evidenced by their vociferous objections, the Petitioning Creditors clearly do not believe suspension is in their best interests. *See generally* Petitioning Creditors' Opposition to Motion for Reconsideration of Order Denying Motion to Dismiss or Stay Involuntary Chapter 11 Case (Doc. No. 138). Suspension under § 305(a) is appropriate only if it is in "the interests of creditors and the debtor."

Even if the Court were to disregard the creditors' interests, the concern for economy and efficiency of administration does not support suspension of the proceedings. Marciano focuses only upon the possibility of reducing costs—the "economy of administration" prong of the test. He does not address the "efficiency of administration"—the need to resolve disputes expeditiously. A suspension of the proceedings pending resolution of the appeals would substantially delay the administration of the involuntary petition.

1    Marciano argues that the involuntary petition may prove unnecessary if the California Court of Appeal reduces

2    the judgments such that Marciano can afford to pay them. This argument presupposes that Marciano would begin

3    paying the judgments if he could afford to do so. The record in the Superior Court suggests that Marciano would not

4    willingly satisfy the judgments, even if he could. Furthermore, Marciano has not explained why the pendency of the

5    appeals prevents him from proposing a Chapter 11 plan. Chapter 11 plans dealing with large adverse judgments are

6    not uncommon; multiple possible resolutions exist.

7        A consideration of the remaining factors weighs against suspending proceedings. The possibility of a less

8    expensive out-of-court workout is minimal (factor five), and there is no non-federal insolvency proceeding (factor

9    six). As discussed above, Petitioning Creditors have not sought bankruptcy jurisdiction for an improper purpose

10    (factor seven). Marciano contends that factors three and four weigh in his favor, because suspending the proceedings

11    would achieve an equitable distribution of assets as well as promote a just and equitable solution. However, this

12    presumes that Marciano will prevail on appeal. Moreover, suspension would impose significant additional delay

13    upon the judgment creditors, and bankruptcy proceedings might be necessary even if the P.C. Judgments are

14    reduced. Although factor two weighs in favor of Marciano given the pending state court appeals, one factor is not

15    enough to tip the balance in Marciano's favor. The Court declines to suspend the proceedings.

16    **IV. Conclusion**

17        Petitioning Creditors' Second Motion for Summary Judgment is granted. The Court will enter an order for relief

18    against Marciano. Marciano's Motion for Reconsideration and cross-motion for summary judgment are both denied.

19    The Court will enter appropriate orders.

20                                    ###

21

22

23        DATED: December 28, 2010            _____
                                            United States Bankruptcy Judge

24

25

# SERVICE LIST

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of December 27, 2010, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Bradley E Brook    bbrook@bbrooklaw.com, jimmy@bbrooklaw.com;brookecfmail@gmail.com
- Peter A Davidson    pdavidson@ecjlaw.com
- Dare Law    dare.law@usdoj.gov
- Daniel J McCarthy    dmccarthy@hillfarrer.com
- Anthony J Rothman    anthony@arothmanlaw.com
- Kenneth N Russak    krussak@frandzel.com, efiling@frandzel.com;ltokubo@frandzel.com
- Richard Seegman    rseegman@wolfgroupla.com, kmanning@wolfgroupla.com;ltarring@wolfgroupla.com
- Ramesh Singh    claims@recoverycorp.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page